**Mary COSGROVE, et al., Plaintiffs,**

**v.**

**Louis W. SULLIVAN, in his capacity as Secretary of the Department of Health and Human Services, et al., Defendants.**

**No. 85 Civ. 4472 (GLG).**

United States District Court, S.D. New York.

March 26, 1991.

Brown & Seymour, New York City (Whitney North Seymour, Jr. and Craig A. Landy, of counsel), for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Lorraine S. Novinski, Sp. Asst. U.S. Atty., of counsel), for defendants.

## MEMORANDUM DECISION

GOETTEL, District Judge.

Having obtained a verdict that will produce cash benefits for the class of hundreds of millions of dollars, the plaintiffs' counsel, Brown & Seymour, now moves for an award of attorneys' fees and the appointment of a Special Master. The Department of Health and Human Services ("HHS") opposes both applications.

This case has an extensive history which has been reported in the prior decisions of this court and the Second Circuit Court of Appeals. *See, e.g., Cosgrove v. Bowen*, 898 F.2d 332 (2d Cir.1990); *Cosgrove v. Bowen*, 668 F.Supp. 163 (S.D.N.Y.1987); *Cosgrove v. Bowen*, 649 F.Supp. 1433 (S.D.N.Y.1986). Because of this, we will not belabor the facts except to say that plaintiffs' counsel has obtained an exceptional result on behalf of a class composed of Medicare recipients and doctors treating such recipients who have taken an assignment of benefits. They accomplished this in the face of adamant and persistent resistance (which continues to this day) from HHS. Their victory is a testament to the extremely high quality of legal services rendered by the plaintiffs' firm. Moreover, they accomplished this without the usual input of massive legal time, which has become the vogue in the *Lindy/Grinnell* era described below.[1]

---

1. The total "lodestar" in this case, which represents hours worked multiplied by a reasonable hourly rate, is $114,398.00. A single partner, Whitney North Seymour, Jr., and a single associate, Craig A. Landy, worked on the case. Mr. Seymour is, *inter alia*, a former United States Attorney for this district and a Special Prosecutor of a cabinet officer in Washington, D.C.

■ HHS's ostrich-like opposition notwithstanding,[2] plaintiffs' counsel is entitled to a very substantial fee. The only problem is to determine an appropriate amount. Plaintiffs' counsel argues that the lodestar approach should be abandoned and that the court should award fees on a common fund basis, giving them a small percentage of the common fund. HHS opposes this on a number of grounds. Initially, it argues that no common fund has been created because the judgment against it is not for a fixed amount and while there will be thousands of recipients, each does not have a presently ascertainable share in the total monetary recovery. We find this rigid approach unrealistic. Common fund payments have been authorized in cases against government agencies when entitlement benefits have been wrongfully withheld. *See, e.g., Puerto Rico v. Heckler,* 745 F.2d 709 (D.C.Cir.1984). *But cf. Holbrook v. Pitt,* 748 F.2d 1168 (7th Cir.1984) (no payments when common fund has not been established). Moreover, it is not unusual in private common fund cases to have the amount of the fund fluid or unfixed, and in many instances unused portions of the fund revert to the defendant contributors. HHS also argues that the administrative difficulties involved in distributing the burden of such fees over all benefitted individuals ultimately will delay the payment of benefits. We do not see such a problem here. If a common fund approach is used, an appropriate fee can be calculated for attorneys' fees and costs and, thereafter, a set percentage can be deducted from each payment to satisfy this obligation. Thus, we find that the appropriate method of payment here is from the common fund.[3]

The next and more difficult issue, however, is whether we can simply award a percentage of the common fund in light of the existing appellate authority in this circuit supporting the lodestar approach. The lodestar had its origin in the Third Circuit's decision in *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973). It was adopted in this circuit in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974) ("Grinnell I"). *See also City of Detroit v. Grinnell Corp.,* 560 F.2d 1093 (2d Cir.1977) ("Grinnell II"). While the advantages to a lodestar approach are readily apparent, its defect has been gradually revealed and it is today an anathema in many circles. *See, e.g., In re Union Carbide Corp.,* 724 F.Supp. 160 (S.D.N.Y.1989) (Brieant, C.J.). Indeed, in the Third Circuit, the cradle of the lodestar, Professor Arthur Miller of Harvard Law School was appointed to evaluate the lodestar approach. He concluded that any approach based on attorneys' hours expended did not produce a fair result in common fund cases and recommended that all fee awards in such cases be a percentage of the fund. Report of the Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237 (1985).

■ While we are sympathetic to the defects in the lodestar approach, we do not have the authority to abandon it completely even in what is realistically a common fund case. On the other hand, however, even the lodestar approach does not stringently require a payment based solely on hours expended. A contingency factor multiplier has always been allowed. *In re Agent*

---

**2.** While HHS's papers oppose the application for attorneys' fees, we understand from oral argument that it would not be opposed to the payment of a small fee based on Government rates.

**3.** HHS further argues:

Similarly, the amount to be deducted from an individual class member's check in the scheme suggested by plaintiffs would depend upon the proportion obtaining between the amount of that check on the one hand, and the total amount of all checks to be issued on the other. Thus no individual class member's check could be issued until the very last recalculation had been completed, since it is only at that point in time that the total amount of benefits to be paid will be known.

Memorandum of Law in Opposition to Plaintiffs' Fee Application at 12. This problem does not arise in this case since there can be no doubt that the fund will exceed $100,000,000.00. A fee can be set based upon this estimate, with the fee to be paid by deducting a set percentage from each payment made to benefitted individuals. Thus, there is no need to attempt to deduct a flat amount from all payments.

*Orange Prod. Liab. Litig.*, 818 F.2d 226 (2d Cir.1987). Moreover, the result obtained in litigation has always been a major consideration in the fee ultimately charged, even in non-contingency cases. Finally, in a case decided by the Second Circuit less than one year ago, the groundwork was laid for the possible elimination of the lodestar approach. In *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1326–28 (2d Cir.1990), the court determined that a fund had been created and that attorneys' fees were mandated. While not explicitly deciding the approach to be applied, the court emphatically stated that the most important consideration in calculating the fee was "the value to the class of the legal work performed." *Id.* at 1328. Thus, even if the lodestar approach remains the law of this circuit, the fund plaintiffs' counsel has created cannot be ignored.

When a small law firm successfully battles a huge bureaucracy to obtain justice for a class, with a result that confers enormous benefits on the class, such services should be appropriately rewarded. If they are not, there will simply be no incentive for public interest law firms to undertake such difficult assignments. In addition, since we believe that the payment should come out of the common fund (subject only to court approval), rather than from defendant HHS, the suggestion of HHS that this approach involves impermissible feè shifting does not appear relevant.

■ It is true that the theoretical amount of benefits payable cannot be accurately ascertained. HHS puts this potential amount as $400,000,000.00. Even more difficult to estimate is the percentage of the class which will learn of its rights and make application for payments.[4] It does

appear reasonably certain that the payments will exceed $100,000,000.00.[5] Under these circumstances, we set the prevailing counsel's fee at $1,000,000.00, said sum to be paid by deducting 1% from all benefit payments made by HHS. If the total sums so obtained exceed $1,000,000.00, HHS is directed to segregate those additional funds in a separate account, subject to further order of the court.[6] In addition, plaintiffs' counsel are entitled to their disbursements in the amount of $6,078.14, with interest from the date of this award.

We turn now to the application for the appointment of a Special Master to oversee the payments in this case. This action was commenced nearly six years ago. Over four years ago, this court found in favor of the plaintiffs. *See* 649 F.Supp. at 1439; 668 F.Supp. 163 (motion to reargue). Many years have passed since then. While a substantial portion of the delay was due to the refusal of the Second Circuit to accept an interlocutory appeal, and its taking over a year to decide the appeal when ultimately filed from final judgment (which was entered on November 16, 1988), a substantial portion of the delay has been due to the tactics of HHS. Indeed, it has been more than a year since the affirmance of the district court's decision and HHS is still blathering about its administrative difficulties in determining who should receive the payments. It complains about the administrative difficulties in recomputing benefits because there are some 48 private organizations administering Medicare for it (organizations such as Blue Cross).

Under the circumstances, the appointment of a Special Master to prod the HHS out of its present reluctant snail's pace is

---

4. At the present time, we are depending on HHS to identify those entitled to benefits. As is noted below, it has accomplished little so far. The minimum age of the Medicare patients in the class is over 70 years and the average age is probably 80 or more. A not insubstantial portion of this sub-class may have died by this time.

5. The $400,000,000.000 figure initially was set forth in HHS's May 23, 1990 petition for rehearing *en banc* before the Second Circuit.

6. We anticipate that there will be further legal expenses in this matter, either by the plaintiffs' firm or by a Special Master. *See infra.* We can determine what to do with the excess deductions, if any, at an appropriate time. Should we decide to discontinue the deduction at any given point, it will not result in an unfair loss to those who have had it deducted since by getting their payments months earlier, they will have realized the benefit of at least 1%.

certainly a matter to be considered. HHS objects to the appointment of a Special Master as interference with the administrative functions of the executive branch. Yet, it is not the executive branch which has the administrative problems—it is the private agencies administering Medicare. The only aspect of HHS operations with which the Special Master would be involved is the making of payments to the class, which are matters already being handled by private agencies. Consequently, *Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011, 1042–49 (2d Cir. 1983), is clearly inapplicable.

Defendant argues that the court lacks power to appoint a Special Master except under Federal Rule of Civil Procedure 53. This is a "matter[ ] of account and of difficult computation of damages" and, therefore, is within the rule. For that matter, the position that we envisage is not necessarily that of a Special Master, but rather, a court monitor. The court has equitable powers in this regard. *Feliciano v. Barcelo*, 672 F.Supp. 591, 622–623 (D.P.R.1986).

The only argument offered by defendant which seems to have any weight is its claim that a Special Master or monitor could not do anything more than HHS is already doing to move the private organizations along. If this is so, we anticipate seeing some prompt action with respect to recomputation and payments. If the pace does not pick up, such a monitor will be appointed. For the time being, we will reserve decision.

SO ORDERED.