**BOARD OF GOVERNORS OF
the FEDERAL RESERVE
SYSTEM, Plaintiff,**

**v.**

**Ghaith R. PHARAON, Defendant.**

**No. 91 Civ. 6250 (PKL).**

United States District Court,
S.D. New York.

Dec. 26, 1991.

Otto G. Obermaier, U.S. Atty. S.D.N.Y. (Thomas A. Zaccaro, of counsel), New York City, Thomas Baxter, Legal Dept., Federal Reserve Bank of New York (R.K. Bhala, Esq., of counsel), New York City, for plaintiff.

Johnson & Gibbs, P.C., (K. Chris Todd, Esq., of counsel), Washington, D.C., for intervenor, InterRedec, Inc.

Randy M. Mastro, Gibson, Dunn & Crutcher, (Jeffrey C. Levy, Esq., of counsel), New York City, Court Appointed Monitor.

## OPINION AND ORDER

LEISURE, District Judge.

In this action, InterRedec, Inc. ("InterRedec"), now moves the Court, pursuant to Fed.R.Civ.P. 60(b)(5) and 65(b), for modification of a Stipulation and Order signed by the Court on October 11, 1991 ("October 11 Stipulation").[1] The October 11 Stipulation modified the September 17, 1991 Temporary Restraining Order ("TRO") that was issued by this Court on the application of the Board of Governors of the Federal Reserve System ("Federal Reserve"), initiating this action against the defendant, Ghaith R. Pharaon ("Pharaon"). For the following reasons, the Court hereby appoints Randy A. Mastro, Esq., of Gibson, Dunn and Crutcher, as a Special Master, pursuant to Fed.R.Civ.P. 53, to assist the Court in the administration of the Escrow and Security Agreement ("Escrow Agreement") that was incorporated by reference into the October 11 Stipulation.

## BACKGROUND

### A. *The September 17 Temporary Restraining Order*

On September 17, 1991, the Federal Reserve applied to this Court for a TRO in aid of an administrative proceeding (the "administrative proceeding") pending before Administrative Law Judge Walter J. Alprin of the Office of Financial Institution Adjudication. The administrative proceeding was initiated by the Federal Reserve on September 13, 1991, and sought a $37 million civil penalty against Pharaon for alleged violations of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. § 1841–1850.

The Federal Reserve alleges in the administrative proceeding and before this Court that Pharaon received approval from the Federal Deposit Insurance Corporation in June 1985, pursuant to 12 U.S.C. § 1817(j), for his acquisition of 100% of the shares of the Independence Bank, Encino, California ("Independence"), based on his representation that the acquisition was being made in his individual capacity. In fact, contends the Federal Reserve, Pharaon purchased Independence on behalf of the Bank of Credit and Commerce International, S.A., Luxembourg ("BCCI") and International Credit and Investment Company (Overseas) Ltd., George Town, Grand Cayman ("ICIC"), pursuant to a Nominee Agreement that ICIC had entered into with Pharaon on BCCI's behalf.

The TRO was sought pursuant to 12 U.S.C. § 1818(i)(4), which provides that:

(4) Prejudgment Attachment.—

(A) In general.—In any action brought by an appropriate Federal banking agency ... in aid of, or to enforce an order in, any administrative or other civil action for money damages, restitution, or civil money penalties brought by such agency, the court may, upon application of the agency, issue a restraining order that—

(i) prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property ...

(B) Standard.—A permanent or temporary injunction or restraining order shall be granted without bond upon a prima

---

1. InterRedec was granted leave to intervene in the instant action, for the limited purpose of seeking a modification of the October 11 Stipulation, by Stipulation and Order dated December 12, 1991.

**644**

facie showing that money damages, restitution, or civil money penalties, as sought by such agency, is appropriate.[2]

Section 1818(i)(4) was enacted on November 29, 1990, as part of Pub.L. No. 101–647, Tit. XXV, § 2521(b)(1), with a remarkable dearth of legislative history. The name of Title XXV was "Banking Law Enforcement," and the name of the Subtitle containing the relevant amendment was "Protecting Assets from Wrongful Disposition." *See* 1990 U.S.Code Cong. & Admin.News (104 Stat.) 4859, 4863. The only comment on the statute itself was the broad statement that "[t]he purpose of ... Banking Law Enforcement is to enhance the enforcement powers of the Department of Justice and the Federal financial institution regulatory agencies with respect to unlawful activities affecting federally insured financial institutions." H.R.Rep. No. 101–681(I), 101st Cong.2d Sess. 74, *reprinted in* 1990 U.S.Code Cong. & Admin.News 6472, 6478.

█ Examining the face of section 1818(i)(4) and its sparse legislative history, it is clear to the Court that Congress was concerned with preventing capital flight in the wake of allegations of bank fraud. Thus, the issuance of a TRO is mandatory upon a prima facie showing that the remedy sought by the agency is appropriate.[3] Accordingly, the Court issued a TRO that enjoined the "withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property which [Pharaon] either owns or controls, directly or indirectly, or through a business entity he owns or controls." TRO, at 3. The TRO also enjoined the sale of the American Southern Insurance Company ("American Southern"), a subsidiary of InterRedec, to Vista Resources, Inc. ("Vista").

**B. *The October 11 Stipulation and the Escrow Agreement***

In response to InterRedec's request for permission to consummate the sale of American Southern, and as a result of extensive negotiations, the Federal Reserve and InterRedec executed, and the Court signed, the October 11 Stipulation, which incorporated the Escrow Agreement by reference. The October 11 Stipulation permitted the sale of American Southern to proceed, contingent on the proceeds of the sale being deposited into an escrow account to be maintained by the Federal Reserve Bank of New York. It was stipulated and agreed that a $42 million balance in cash, notes and property would be maintained in escrow, sufficient to cover the potential $37 million penalty facing Pharaon, and a $5 million tax claim asserted by Vista against American Southern. Among the collateral to be included in the escrow account was a first priority lien on the Sterling Bluffs Plantation, in Richmond Hill, Georgia ("Sterling Bluffs"), and a second priority lien on the Ramada Resort Maingate East Hotel, in Kissimmee, Florida ("Ramada Resort"). *See* Escrow Agreement, at 4–9.

Under the Escrow Agreement, InterRedec was given a conditional right to withdraw cash from the escrow account, if two conditions are met. First, InterRedec must deposit other property into escrow to substitute for the withdrawn cash, "such that

---

**2.** Support for the TRO can also be drawn from the newly enacted Federal Debt Collection Procedures Act of 1990, codified at 28 U.S.C. §§ 3001–3308. *See* Pub.L. No. 101–647, Tit. XXXVI, § 3611, 1990 U.S.Code Cong. & Admin.News (104 Stat.) 4933–4966 (Nov. 29, 1990). However, 12 U.S.C. § 1818(i)(4) is the specific statutory provision that controls the instant case.

**3.** The Court recognizes that section 1818(i)(4) poses due process concerns if construed to require injunctive relief, without a hearing, in any case where the government produces more than a scintilla of evidence establishing that the remedy sought by the agency is proper. *See Fuentes*

*v. Shevin,* 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972); *Pinsky v. Duncan,* 898 F.2d 852, 854–55 (2d Cir.1990), *aff'd, Connecticut v. Doehr,* —— U.S. ——, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991). However, the due process ramifications of section 1818(i)(4) have not been raised by the parties, and are not properly before the Court. Moreover, the due process concerns are not implicated in this case: the parties to this action, including InterRedec, have consented to the extensions of the TRO. *See* Fed.R.Civ.P. 65(b) (TRO may be extended beyond ten days if "party against whom the order is directed consents that it may be extended for a longer period").

the [Federal Reserve] shall remain secured to its satisfaction ... after withdrawal of any cash." *Id.* at 16. The determination whether this condition is met is "in [the Federal Reserve's] sole discretion." *Id.* at 17. However, in making its decision, the Federal Reserve must apply "reasonable commercial standards," *id.* at 23, including an appraisal "by an independent appraiser selected by the [Federal Reserve] but compensated by InterRedec." *Id.*

The second condition requires that cash withdrawals be expended for an approved purpose. *Id.* The Escrow Agreement provided for the appointment of a Monitor, Randy M. Mastro, Esq., of Gibson, Dunn and Crutcher, to monitor InterRedec's withdrawal requests and to ensure that they are for purposes approved by the Escrow Agreement. *See* Escrow Agreement, at 16–17.[4] It is clear, however, that the Monitor's approval of a withdrawal does not demonstrate that InterRedec is in substantial compliance with its obligations under the Escrow Agreement. Rather, the Monitor's role is to ensure that withdrawal requests are for approved purposes; under the Escrow Agreement, it is within the sole discretion of the Federal Reserve to decide whether the $42 million escrow requirement is being met, and, consequently, whether a withdrawal should be permitted.

### C. *Status of the Escrow Account and Pending Withdrawal Requests*

The parties are in agreement that four assets have been deposited into escrow to date:

—$19.5 million cash proceeds from sale of American Southern, from which $1.32 million has already been withdrawn;

—Vista promissory note from sale of American Southern, valued by the Federal Reserve at $6.4 million, and by InterRedec at $8 million;

—Stock of Metrobank, Inc. ("Metrobank"), valued by InterRedec at $2 million;

—Sterling Bluffs property, valued by the Federal Reserve at $11.5 million, and by InterRedec at $20 million.

*See* Memorandum of Law in Support of InterRedec's Order to Show Cause for Modification of Preliminary Injunction and Escrow Agreement ("InterRedec Motion"), at 6. By the Federal Reserve's estimate, the escrow account currently holds $37,-861,370; in contrast, InterRedec claims that the value of the assets being held in escrow is $48.4 million. *Compare* Memorandum of Plaintiff Board of Governors of the Federal Reserve System in Opposition to the Motion of InterRedec, Inc. *to Modify* the Preliminary Injunction and Escrow Agreement ("Government Response"), at 8–9 *with* InterRedec Motion, at 5–6, 13.

Thus far, the Federal Reserve has paid $1.32 million out of escrow: $500,000 to American Specialty Insurance Company ("American Specialty"), a second tier subsidiary of InterRedec, to allow it to pay claims in an orderly manner; and $813,942, in payment of a litigation settlement. The Federal Reserve agreed to these withdrawal requests, which left approximately $18.3 million in escrow, only after InterRedec agreed to deposit the Metrobank stock into escrow as additional collateral.

InterRedec has also made additional requests, totaling $1.89 million. Specifically, InterRedec has requested $375,000 to make a quarterly interest payment to the Banque Arabe et International d'Investissement ("BAII"); $500,000 for an additional cash infusion for American Specialty; $914,000 for a tax payment made on behalf of American Southern; and $105,000 closing costs incurred as a result of the sale of American Southern. *See* Government Response, at 9–10. InterRedec claims that failure to receive the money for the BAII loan will lead to foreclosure, and that without a capital infusion American Specialty will be forced into bankruptcy. *See* InterRedec Motion, at 8.

None of these four additional withdrawal requests has been granted by the Federal

---

**4.** InterRedec also must submit all proposed transactions over $100,000 to the Monitor for

his approval. *See* October 11 Stipulation, at 3.

Reserve, and only the $375,000 request for funds to pay the BAII loan has been approved by the Monitor. The withdrawal request for $500,000 in additional capital for American Specialty is currently pending, but the Monitor has withheld his approval until InterRedec produces adequate documentation to support the request. Further, although specifically authorized in the Escrow Agreement, the $914,000 and $105,000 requests have not been approved because the Federal Reserve claims that InterRedec has not maintained a $42 million balance in escrow.

The Court also notes that InterRedec's withdrawal requests have been met with some skepticism by the Federal Reserve and the Monitor. For example, despite the assertion that failure to infuse additional cash into American Specialty will result in action by the Georgia Insurance Commissioner to place the company into receivership, *see* InterRedec Motion, at 11, the Monitor was informed by the Georgia Department of Insurance that no action against American Specialty is contemplated. *See* Transcript of Oral Argument, heard on December 18, 1991 ("Transcript"), at 27. Further, the government points to InterRedec's current cash holdings of over $2 million, and asserts that these funds can be used to satisfy the immediate obligations faced by InterRedec and its subsidiaries. *See* Government Response, at 19–20.

### D. *InterRedec's Instant Application*

Faced with the Federal Reserve's refusal to honor these requests, and asserting that it "desperately needs this cash to remain in business," InterRedec has moved the Court for a withdrawal of $10 million from escrow.[5] InterRedec Motion, at 7. Although the immediate motivation for the application was the Federal Reserve's refusal to honor the $1.89 million in pending requests, InterRedec has provided a series of figures concerning the money it purportedly will need to continue operating. The smallest figure provided by InterRedec is $875,000,

to pay the BAII loan and to allow American Specialty to continue paying claims in the ordinary course. *See* InterRedec Motion, at 7–8. InterRedec next claims that it needs $1.375 million by December 31, 1991. *See* InterRedec Motion, at 10. The Court assumes that this figure includes $375,000 for BAII, $500,000 for American Specialty, and $500,000 for Montgomery Cablevision & Entertainment, Inc. ("Montgomery"). *See id.* at 12.

The Court next turns to the figure of $3.7 million that InterRedec contends is necessary to maintain itself over the next 90 days. *See id.* at 10. This figure is not itemized, but the Court believes that it includes $1.5 million for Montgomery, $500,000 for American Specialty and $1.7 million to pay principal and interest to BAII. *See id.* at 11–12. InterRedec next claims that it needs $5,789,000 to cover its expenses over the next seven months. *See id.* at 10; InterRedec Order to Show Cause for Modification of Preliminary Injunction, issued on December 11, 1991, Exh. 12. Finally, InterRedec moves the Court to allow withdrawal of $10 million from escrow to "afford InterRedec's officers the freedom necessary to run the business in its ordinary course without substantial outside interference." InterRedec Motion, at 14.

Examining these numbers, it is clear that they are not mutually exclusive. Rather, the figures appear to reflect what InterRedec contends to be its ever-increasing need for cash to continue running is businesses. Nevertheless, despite the appearance of consistency that exists on the face of InterRedec's papers, it is obvious that the Court is ill-equipped on the record before it to consider the bona-fides of each of these demands and to handle the extraordinary task of monitoring the cash reserves and the financial obligations of InterRedec on a day to day basis.

### E. *Value of the Collateral Held in Escrow*

Since the withdrawal of $1.32 million in cash on October 25 and November 7, 1991,

---

**5.** InterRedec also moved the Court to raise the size of transactions that require the prior approval of the Monitor to $500,000. However, this application, which the Court considered to

be an attempt by InterRedec to escape the oversight it agreed to in the Escrow Agreement, was withdrawn at the Oral Argument. *See* Transcript, at 21.

in return for a deposit into escrow of the Metrobank stock, the Federal Reserve has not allowed InterRedec to make a cash withdrawal from escrow. This refusal has been based on the Federal Reserve's rights under the Escrow Agreement: in return for allowing InterRedec to sell American Southern, the Federal Reserve was given the sole discretion to determine the value of the collateral and to decide whether the collateral was sufficient to justify a cash withdrawal. *See* Escrow Agreement, at 17. However, conflicts have arisen concerning the proper valuation of the collateral deposited into escrow, and InterRedec has asserted, in its application to the Court, that the Federal Reserve is relying on commercially unreasonable appraisals.

The primary valuation dispute concerns Sterling Bluffs.[6] As required by the Escrow Agreement, the Federal Reserve is relying on an appraisal by an independent appraiser, Considine & Company ("Considine"). After completing an appraisal that "was not based on a requested minimum valuation, a specific valuation, or the approval of a loan," Declaration of Thomas A. Zaccaro, Esq., executed on December 16, 1991, Exh. A., at 1 (Considine Sterling Bluffs Appraisal), Considine determined the present value of the Sterling Bluffs property to be $11,500,000. *See id.* at 2.

In contrast, InterRedec claims that Sterling Bluffs should properly be appraised at over $20 million, and that methodological flaws in the Considine appraisal make reliance thereon commercially unreasonable. *See* Reply Memorandum of InterRedec, Inc. in Support of Order to Show Cause Why the Preliminary Injunction and Escrow Agreement Should Not Be Modified ("InterRedec Reply"), at 4; Affidavit of John R. Crow, sworn to on December 18, 1991 ("Crow Affidavit"), Exh. 3D (August 1990 appraisal of Sterling Bluffs). While InterRedec has engaged its own independent appraiser to determine the value of Sterling Bluffs, the appraisal will not be complete until mid-January 1992. *See* Crow Affidavit ¶ 7. In addition, the Court has not yet been provided with sufficient evidence to conclude whether or not the Considine appraisal was commercially reasonable. It therefore is obvious that the record currently before the Court is inadequate for reaching an informed decision concerning the proper value of Sterling Bluffs.[7]

In addition to these disputes, the parties cannot agree on the proper valuation of the assets that InterRedec has offered to deposit into escrow to substitute for the proposed cash withdrawals. For example, InterRedec has offered to grant to the Federal Reserve a negative pledge on three Florida properties in which it has an interest: the Ramada Resort, the Parkway Village Apartments and the Parkway Pavilion Shopping Center, in Kissimmee and Osceola, Florida. *See* InterRedec Reply, at 7. This offer has been rejected, because the Federal Reserve does not believe that the negative pledge will have priority over the claims of Pharaon's other potential judgment creditors. Moreover, the Federal Reserve claims that the first mortgages on these properties preclude the grant of additional encumbrances without the consent of the first lien holders, and InterRedec concedes that these lien holders have refused to consent to the negative pledge.

Having overviewed the valuation conflicts, the Court finds that it is ill-equipped to handle the task of determining the proper valuation of the diverse assets at issue in this case on the current record. The volume of the task and the need for ongoing, immediate attention and supervision indicates to the Court that this is an extraordinary situation that can be handled most efficiently by the appointment of a neutral arbiter to independently evaluate

---

6. The Federal Reserve and InterRedec also dispute the valuations of the other assets deposited into escrow. *Compare* InterRedec Motion, at 13 *with* Government Response, at 8–9.

7. Because of the defects in the record currently before the Court, and because InterRedec has sufficient cash reserves to pay its immediate obligations, the Court must deny InterRedec's request for an immediate withdrawal of $1.375 million from escrow. *See* InterRedec Reply, at 3.

the parties' positions on the proper valuation of the assets currently being held in escrow. The Court therefore turns to consider the propriety of the appointment of a Special Master, to provide a neutral valuation of the withdrawal requests and the property valuations, and to assist the Court in making the legal and factual determination whether the Federal Reserve and InterRedec are acting in a commercially reasonable manner, and are in substantial compliance with their obligations under the Escrow Agreement.

## DISCUSSION

### A. *Application for Modification of TRO and Escrow Agreement*

■ InterRedec's application to modify the TRO and the Escrow Agreement is made under Fed.R.Civ.P. 60(b)(5) and 65(b). Rule 60(b)(5) provides that "the court may relieve a party ... from a final judgment, order, or proceeding ... [if] it is no longer equitable that the judgment should have prospective application." Although by its terms Rule 60(b)(5) concerns final orders, it has been interpreted to extend to modifications of preliminary injunctions. *See Consolidated Gold Fields PLC v. Anglo American Corp. of South Africa, Ltd.*, 713 F.Supp. 1455, 1455 (S.D.N.Y.1989); 11 Wright & Miller, Federal Procedure and Practice §§ 2863, 2961 (1973). The application for relief is also proper under Rule 65(b). *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers*, 415 U.S. 423, 441, 94 S.Ct. 1113, 1125, 39 L.Ed.2d 435 (1974).

■ The rationale for reexamination and modification of an injunction has been explained by the Second Circuit as follows:

While changes in fact or in law afford the clearest bases for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.

*King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (2d Cir.1969) (Friendly, J.); *see also United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (Cardozo, J.) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need."); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 971–72 (2d Cir.) (Friendly, J.) (remanding for determination whether modification of consent decree is proper), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). Proposed modifications of injunctions and consent decrees must be scrutinized to determine whether the proposed amendment furthers the goals of the initial agreement. *See Kozlowski v. Coughlin*, 871 F.2d 241, 246 & n. 9 (2d Cir.1989); *Association for Retarded Children, supra*, 706 F.2d at 969.

■ Although a court may properly exercise its equitable power to modify an injunction that has become inequitable, modification is not a proper remedy when a party to a consensual order is dissatisfied with the bargain that was reached. *See Kozlowski, supra*, 871 F.2d at 246 ("The exercise of equity, however, does not permit a court to indulge a party's discontent over the effects of its bargain"). Moreover, a Stipulation and Order is analogous to a consent decree. *See United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). Thus, when considering the enforcement of the rights of the parties under a Stipulation and Order, a court must adhere to the bargain reached by the parties, and cannot substitute its own view of the proper bargain that should have been struck. *See EEOC v. Local 580, Int'l Ass'n of Bridge, Structural And Ornamental Ironworkers*, 925 F.2d 588, 592 (2d Cir.1991) (consent judgment analogous to a contract); *SEC v. Levine*, 881 F.2d 1165, 1179 (2d Cir.1989) ("consent judgments should be interpreted in a way that gives effect to what the parties have agreed to").

In the case at bar, InterRedec argues that the TRO and Escrow Agreement should be modified because there has been a change in circumstances, making enforcement of the injunction inequitable. *See* InterRedec Motion, at 16. However, Inter-

Redec has not demonstrated that there has been any change of circumstances in this case. *See, e.g., Kozlowski, supra,* 871 F.2d at 249 (rejecting modification of consent judgment for failure to show change in circumstances). Rather, the Court believes that InterRedec is dissatisfied with the bargain it negotiated with the Federal Reserve, in which InterRedec bargained for the right to sell American Southern and ceded to the Federal Reserve the right to choose an independent appraiser and to decide, *in its sole discretion,* whether deposits of collateral are sufficient to justify cash withdrawals.

B.  *Appointment of a Special Master under Fed.R.Civ.P. 53*

■ While the Court is bound by the agreement of the parties, the October 11 Stipulation does provide a framework for evaluating whether the parties are in substantial compliance with the Escrow Agreement. Judicial scrutiny of the October 11 Stipulation must focus on whether the Federal Reserve is acting in a commercially reasonable manner in determining the value of the collateral deposited into escrow. *See* Escrow Agreement, at 17. Nevertheless, the state of the record and the extraordinary circumstances of this case demonstrate that a neutral arbiter is needed to synthesize and evaluate the parties' various valuations and to adequately prepare the Court to determine if the Federal Reserve is acting reasonably in refusing to honor InterRedec's withdrawal requests.

Under Fed.R.Civ.P. 53,

The court in which any action is pending may appoint a special master.... A reference to a master shall be the exception and not the rule.... [I]n actions to be tried without a jury, save in matters of account ... a reference shall be made only upon a showing that some exceptional condition requires it.

*See Republic of Philippines v. New York Land Co.,* 852 F.2d 33, 35–36 (2d Cir.1988) (affirming appointment of special property advisor); *Collins v. Foreman,* 729 F.2d 108, 118 (2d Cir.) ("special masters ... are properly seen as adjuncts to the district court"), *cert. denied,* 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); *Association for Retarded Children, supra,* 706 F.2d at 962–65 (affirming appointment of special master); *Cosgrove v. Sullivan,* 759 F.Supp. 166, 170 (S.D.N.Y.1991) (appointing special master/monitor under Fed.R.Civ.P. 53 and court's equitable power); *In re "Agent Orange" Product Liability Litigation,* 689 F.Supp. 1250, 1267 (E.D.N.Y. 1988) (appointing special master in complex litigation context).

Pursuant to Rule 53(c), the special master's powers are delineated in an order of reference, which "may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only." *See Johnson v. Kay,* 680 F.Supp. 107, 109–10 (S.D.N.Y. 1988) (order of reference gave special master "considerable latitude in the method of reporting"). Although the court must accept the master's findings of fact unless clearly erroneous, the parties have ten days to submit objections to the master's report, and the Court then "may adopt the report or may modify it or may reject it in whole or in part." Fed.R.Civ.P. 53(e)(2). In addition, under Rule 53(e)(4), the master's findings can be final if the parties consent. *See Collins, supra,* 729 F.2d at 118.

The role of the Special Master is not meant to supplant the role of the court. For example, "the master's legal conclusions ... are entitled to no special deference." *Collins, supra,* 729 F.2d at 118. Thus, in the instant case, the Court must make its own determination concerning the commercial reasonableness of the actions of Federal Reserve. However, the Court is handicapped in reaching this determination by the absence of an adequate record and by the need for a neutral view about the actual value of the property.

The Court therefore appoints Randy M. Mastro, Esq., as a Special Master, pursuant to Fed.R.Civ.P. 53, to determine the appraised value of the property being held in and proposed for deposit into escrow. Because of the expertise he has already developed as the Court-appointed Monitor in this

case, and because of his acquaintance with the principals and their respective positions, Mr. Mastro is particularly well-suited for this task. Moreover, both the Federal Reserve and InterRedec have consented to the appointment of Mr. Mastro as the Special Master. *See* Reply Letter of Thomas A. Zaccaro, Esq., dated December 19, 1991, at 3; InterRedec Reply, at 4–7. In addition, Mr. Mastro himself has indicated a willingness to assume additional responsibility in this matter, extending to mediation of disputes concerning the commercial reasonableness of the actions of the parties. *See* Letter of Randy M. Mastro, Esq., dated December 19, 1991, at 2; Transcript, at 29.

It shall be the Special Master's responsibility to determine the appraised value of the assets that have been and are proposed for deposit into escrow. The Master shall consider the parties' various appraisals with respect to any asset about which there is a valuation dispute, and is empowered to undertake an independent review of the parties' proposed appraisals and to commission an independent appraisal of the assets. Because a determination of the true value of InterRedec's assets and of the bona fides of InterRedec's requests for cash withdrawals requires an intimate knowledge of InterRedec's corporate structure and capitalization, the Court also orders InterRedec to make all of its books and records available to the Master, for inspection at his convenience, as of January 1, 1992. *See* Fed.R.Civ.P. 53(c) ("The master may require the production ... of all books, papers, vouchers, documents, and writings applicable thereto.").

After completing his examination of the value of the assets, and in the exercise of reasonable diligence, the Special Master shall submit a report to this Court containing his conclusions concerning the proper value of the property he has considered. Both during the pendency of the Master's investigation and after the Report is submitted, the parties are encouraged to continue their dialogue, and the Special Master is empowered to mediate a discussion between the parties with the goal of reaching a compromise concerning InterRedec's right to withdraw cash from escrow. *Cf.* Fed.R.Civ.P. 16(c)(7); *Bell v. A–Leet Leasing Corp.*, 863 F.2d 257, 259 (2d Cir.1988) ("we question whether a more meaningful effort at settlement ... might not have been made in this case ...").

However, if continued judicial intervention is necessary, InterRedec and the Federal Reserve shall have 10 days, pursuant to Rule 53(e)(2), to submit objections to the Master's appraisal of the property. The parties shall concurrently submit to the Court memoranda of law indicating their respective views on whether the Federal Reserve can reasonably refuse to allow InterRedec to withdraw cash from escrow. The Court will thereafter reach an independent conclusion concerning the commercial reasonableness of the Federal Reserve's and InterRedec's actions, based on the Master's conclusions, any objections submitted by the parties and the parties' memoranda of law.

## CONCLUSION

For the foregoing reasons, Randy M. Mastro, Esq., is hereby appointed as a Special Master, pursuant to Fed.R.Civ.P. 53, for the purpose of determining the proper appraised values of the property that has been and is proposed for deposit into escrow under the October 11 Stipulation and the Escrow Agreement. The application of InterRedec to withdraw cash from escrow at this time is denied.

SO ORDERED.