# In re VISA CHECK/MASTERMONEY ANTITRUST LITIGATION

**This Document Relates to All Actions:**

**No. 96 CV 5238(JG).**

United States District Court, E.D. New York.

Dec. 19, 2003.

first 2255 motion."

See, also, 2003 WL 1712568.

Lloyd Constantine, Robert L. Begleiter, Constantine & Partners, P.C., New York City, Lead Attorneys for Plaintiff Class.

M. Laurence Popofsky, Stephen V. Bomse, Heller Ehrman White & McAuliffe, LLP, San Francisco, CA, for Defendant Visa U.S.A. Inc.

Kevin J. Arquit, Joseph F. Tringali, Simpson Thacher & Bartlett LLP, New York City, Kenneth A. Gallo, Clifford Chance LLP, Washington, DC, for Defendant MasterCard International Incorporated.

Lawrence W. Schonbrun, Berkeley, CA, for Roman Buholzer d/b/a The Continental Garden Restaurant.

John W. Davis, Steven Helfand, San Francisco, CA, for Rent Tech, Inc. and Rental Solutions, Inc.

John J. Pentz, Class Action Fairness Group, Sudbury, MA, for Round House, Inc. d/b/a Smuggler's Cove.

Richard J. Archer, Archer & Hanson, Occidental, CA, Matthew Floum, Brooklyn, NY, for Reyn's Pasta Bella, LLC, Jeffrey Ledon Deweese, M.D., Barry Leonard d/b/a Critter Fritters, and Hat-in-the-Ring, Inc. d/b/a Eddie Rickenbacker's.

Joshua R. Floum, Holme Roberts & Owen, LLP, San Francisco, CA, for Wells Fargo Bank, N.A.

Stanley M. Grossman, Pomerantz Haudek Black Grossman & Gross LLP, New York, Golomb Honik & Langer, Philadelphia, PA, for Nu-City Publications, Inc.

Fred T. Isquith, Wolf Haldenstein Adler Freeman & Herz LLP, New York, for Plaintiff Class and Class Representative, UCC QuickDocs, Inc.

John W. Rasmussen, Johnson Rasmussen Robinson & Allen PLC, Mesa, AZ, for Armenta's Mexican Food, Inc. and Lupita Llamas Martinez d/b/a Del Yaqui Restaurant.

Edward W. Cochran, Shaker Heights, OH, John F. Duane, New York City, for Leonardo's Pizza By the Slice, Inc. and 710 Corp.

William Kenneth C. Dippel, Dippel & Davis, PLC, Dallas, TX, for Preston Center Personal Training, Inc.

R. Stephen Griffis, Birmingham, AL, for Sound Deals, Inc. and Digital Playroom, Inc.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

In this antitrust action, a class of approximately five million merchants (the "Class") alleges that, among other things, defendants Visa U.S.A. Inc. ("Visa") and MasterCard International Incorporated ("MasterCard") have illegally tied their debit products to their credit cards, in violation of the Sherman Act. Just as the trial was about to commence, the parties agreed to settle. Essentially, the defendants

promised to untie the two products, and to pay the Class more than $3 billion, in return for the Class' promise to release defendants from the claims in the case and other claims based on the same conduct. Now, lead counsel for the Class, Constantine & Partners, P.C. ("Lead Counsel"), seek approval of these settlements with Visa and MasterCard and of the proposed plan of allocation for distribution of the damages to the Class members. They seek attorneys' fees for their efforts and the efforts of co-counsel[1] in successfully prosecuting the case, and reimbursement of their expenses.

I approve the settlements and the plan of allocation. I also award attorneys' fees in the amount of $220,290,160.44, and authorize reimbursement of costs in the amount of $18,716,511.44.

## BACKGROUND

The claims in the case, and the factual basis for those claims, are set forth in some detail in my decision on the parties' motions for summary judgment, *In re Visa*

*Check/Mastermoney Antitrust Litig.*, No. 96–CV–5238, 2003 WL 1712568 (E.D.N.Y. Apr.1, 2003), and my decision certifying the Class, *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir.2001). Familiarity with those decisions is assumed here. The following is a brief summary of the facts and procedural history relevant to the issue before me.

In a complaint filed on October 25, 1996, the named plaintiffs asserted claims under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. They alleged that the defendants' practice of requiring merchants who accepted defendants' credit cards to also accept their debit products (the "Honor All Cards" rule) was an illegal tying arrangement, in violation of section 1. The plaintiffs further alleged that, through these tying arrangements and other anticompetitive conduct, the defendants attempted to monopolize the debit card market, in violation of section 2.

On February 22, 2000, I certified the Class, and the Second Circuit affirmed

---

1. In addition to Lead Counsel, there are 29 other firms that represent certain Class members. They are: Hagens Berman LLP (for Bernie's Army–Navy Store); Alexander Hawes & Audet (for Shoes, Etc., d/b/a Arnold's Shoes); Leo W. Desmond (for Denture Specialists, Inc. and Geneva White D.M.D., P.A.); Kenneth A. Elan (for Auto–Lab of Farmington Hills and Shark 3 Audio Inc. d/b/a "Bondy's"); Garwin, Bronzaft, Gerstein & Fisher (for Sportstop, Inc.); Lionel Z. Glancy (for Auto–Lab of Farmington Hills); Goodkind Labaton Rudoff & Sucharow LLP (for Shark 3 Audio Inc. d/b/a/ "Bondy's"); Heins Mills & Olson, P.L.C. (for Shoes, Etc., d/b/a Arnold's Shoes); Hoffman & Edelson, LLC (for Shoes, Etc., d/b/a Arnold's Shoes); Jenkins & Mulligan (for Computer Supplies Unlimited); Jeffrey F. Keller (for Sportstop, Inc.); Kirby McInerney & Squire, LLP (for Bernie's Army–Navy Store); Levin Fishbein Sedran & Berman (for Shoes, Etc., Inc., d/b/a Arnold's Shoes and Scrub Shop, Inc.); Lieff Cabraser Heimann & Bernstein (for Shoes,

Etc., Inc., d/b/a Arnold's Shoes and Scrub Shop, Inc.); Lawrence Metzger (for Scrub Shop, Inc.); Milberg Weiss Bershad Hynes & Lerach (for UCC Express, Inc., The Coffee Stop, Inc., d/b/a Torreo Coffee & Tea Company and Payless Shoe Source); Miller, Faucher, Cafferty & Wexler (for Burlington Coat Factory Warehouse, Inc.); Prongay & Borderud (for 53, Inc.); Rabin & Peckel (for Denture Specialists, Inc. and Geneva White D.M.D., P.A.); Rohan Goldfarb & Shapiro, PS (for Bernie's Army–Navy Store); Elwood S. Simon & Associates, P.C. (for Sportstop, Inc.); Harris J. Sklar (for Scrub Shop, Inc.); Spector, Roseman & Kodroff (for The Coffee Stop, Inc., d/b/a Torreo Coffee and Tea); Jerald M. Stein (for Sportstop, Inc.); Robert Taylor–Manning (for Bernie's Army–Navy Store); Trujillo, Rodriguez & Richards (for Shoes, Etc., d/b/a Arnold's Shoes); Wolf Halderstein Adler Freeman & Herz LLP (for UCC Express, Inc.); Zwerling, Schachter & Zwerling, LLP (for 53, Inc.); and Michael Zwick (for Auto–Lab of Farmington Hills).

that order on October 17, 2001. Following the Second Circuit's decision, the parties supplemented their previously filed motions for summary judgment, and oral argument of those motions was held on January 10, 2003. On April 1, 2003, I granted plaintiffs' motions in part and denied them in part. I denied the defendants' motions. The parties then submitted a comprehensive, joint pretrial order. On April 21, 2003, jury selection began.

On April 28, 2003, the day opening statements were to occur, MasterCard agreed to settle with the Class. Because Visa and the plaintiffs were on the precipice of a settlement as well, opening statements in the trial against Visa were postponed for two days. On April 30, 2003, with a jury in the box awaiting opening statements, Visa and the plaintiffs agreed to settle. Thereafter, the parties entered into memoranda of understanding. These memoranda served as blueprints for the final proposed settlement agreements dated June 5, 2003 ("Settlements" or "Settlement Agreements").[2]

The Settlement Agreements are the proposed culmination of approximately seven years of litigation, and represent the largest antitrust settlement in history. They provide, among other things, for:

(1) the cessation, as of January 1, 2004, of defendants' "Honor All Cards" rules, by which the defendants' debit card services to merchants were tied to their credit card services (Settlements ¶ 4);

(2) the creation of a $3.05 billion settlement fund (*id.* ¶ 3(a));

(3) the creation of clear, conspicuous and uniform visual identifiers on Visa and MasterCard debit cards by January 1, 2007 (80% by July 1, 2005), so merchants and consumers can distinguish these products from credit cards (*id.* ¶¶ 5, 7);[3]

(4) the lowering, by roughly one third, of the interchange rates on debit products for the period from August 1, 2003, through December 31, 2003, (*id.* ¶ 8);

(5) other injunctive relief, such as the provision of signage from defendants to merchants communicating the merchants' acceptance of defendants' untied debit products; and a prohibition on defendants enacting any rules that prohibit merchants from encouraging or steering customers to use forms of payment other than defendants' debit cards, including by discounting other forms of payment (*id.* ¶¶ 6, 9);

(6) the Court's continuing jurisdiction to ensure compliance with the Settlement (*id.* ¶ 41); and

(7) the release of Visa and MasterCard from claims arising out of the conduct at issue in the action prior to January 1, 2004 (Visa Settlement ¶ 28; MasterCard Settlement ¶ 30).

Most of the compensatory relief will take the form of cash payments by Visa totaling $2,025,000,000 and by MasterCard totaling $1,025,000,000, in annual installments over the next 10 years. (Lead Counsel's Fee Pet. at 22 ("Fee Pet.") (cit-

---

**2.** The Class entered into separate agreements with Visa and MasterCard. Because the substance of the Settlements are for the most part virtually identical, I will refer to them collectively. Where they differ from one another, I will refer to them separately as the "Visa Settlement" or the "MasterCard Settlement."

**3.** Illustrations of these new identifiers on Visa and MasterCard debit cards are attached to this memorandum as appendices on pages 38 through 41. Page 38 depicts both the original Visa debit card design and the new design; page 39 shows another description of the new Visa design. Pages 40 and 41 show the same with respect to MasterCard debit cards.

ing Settlements ¶ 3).) The relief also includes approximately $846 million—the amount by which the interchange rates for defendants' debit products have been reduced for the period from August 1, 2003 through December 31, 2003. (Fisher Suppl. Dec. ¶¶ 4–6.)[4] The discounted present value of the total compensatory relief, on which Lead Counsel base their requested fee, amounts to $3,383,400,000 (the "Fund"). (Fee Pet. at 3.)

The general terms of the Settlement Agreements were contained in a notice to the Class in July and August 2003.[5] Only 18 merchants, out of approximately five million, filed objections to the Settlements and the plan of allocation.[6] On September 25, 2003, I held a fairness hearing in our ceremonial courtroom to hear argument of those objections and any others that might be raised.

## DISCUSSION

### A. The Settlement

1. *The Standard for Approving a Proposed Settlement*

■ Pursuant to Federal Rule of Civil Procedure 23(e), any settlement of a class action requires court approval. In order to approve such a settlement, the court must assure itself that the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir.2000). The decision to grant or deny such approval lies within the discretion of the trial court, *see In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 473 (S.D.N.Y.1998), and that discretion should be exercised in light of the general policy favoring settlement, *see Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982). In making this determination, a court must neither rubber stamp the settlement nor engage in "the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir.1974) ("*Grinnell I*"), abrogated on other grounds by *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir.2000).

To evaluate whether or not a class settlement is fair, a district court examines the negotiations that led up to the settlement and the substantive terms of the settlement. *See In re Holocaust Victim*

---

4. Professor Franklin M. Fisher, one of the Class' experts, teaches at the Massachusetts Institute of Technology. (Fisher Dec. Ex. FVD–1.) He is an authority in economics, and has written extensively in this area. He has also given testimony in other antitrust litigations. (*Id.*)

5. In the notice, the absent Class members were informed of the status of the case and their rights. This notice included a summary of the claims made and the history of the action; the plan and the fee petition (filed on August 18 pursuant to Court order); the releases, verbatim, as set forth in the proposed Settlement Agreements; a description of their rights to object to the Settlements; and instructions on how they could receive more information about the Settlements, including by calling a toll free number, contacting the claims administrator or Lead Counsel, or by visiting the web site established by Court order.

6. These objectors are: Reyn's Pasta Bella, LLC; Jeffrey Ledon Deweese, M.D.; Barry Leonard d/b/a Critter Fritters; Hat–In–The–Ring, Inc. d/b/a Eddie Rickenbacker's; 710 Corp.; Leonardo's Pizza By The Slice, Inc.; Preston Center Personal Training, Inc.; Armenta's Mexican Food, Inc.; Lupita Llamas Martinez d/b/a Del Yaqui Restaurant; Roman Buholzer d/b/a The Continental Garden Restaurant; NuCity Publications, Inc; MSV Records & Productions, Inc.; Southern Lady Flowers; Sound Deals, Inc.; Digital Playroom, Inc.; Southern Network Services, Inc.; Duke Products, Inc.; and Village Fabrics and Furnishings, Inc. There were a total of 17 merchants who objected to Lead Counsel's fee request.

*Assets Litig.*, 105 F.Supp.2d 139, 145 (E.D.N.Y.2000). As to the first issue, "[t]he [negotiation] process must be examined 'in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves.'" *Id.* at 145–46 (quoting *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983)). In this case, there could not be any better evidence of procedural integrity. Experienced and able counsel on all sides fought aggressively (albeit always with professionalism) for many years, and negotiated feverishly (with the same professionalism) to produce the Settlement Agreements at the eleventh hour. Collusion or coercion could not conceivably have tainted the process. (*See* Green Dec. ¶ 12 ("[I]t is my opinion that the [S]ettlement[s] w[ere] achieved through a fair and reasonable process and [are] in the best interest of the class .... the court system and the mediation process worked exactly as they are supposed to work at their best; a consensual resolution was achieved based on full information and honest negotiation between well-represented and evenly balanced parties.").)[7]

As for substantive fairness, the Second Circuit has held that the relevant factors include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of

the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell I*, 495 F.2d at 463 (citations omitted).

The potential for this complex litigation to result in enormous expense, and to continue for a long time, was great. The complexity of federal antitrust law is well known, *see, e.g., Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713, 719 (E.D.N.Y. 1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought"), as are the particular difficulties with the law that governs tying arrangements, *see, e.g.,* Herbert Hovenkamp, *Tying Arrangements and Class Actions*, 36 Vand. L.Rev. 213, 213 (1983) ("Few areas of federal antitrust law are more confusing than the law that governs tying arrangements."). This action would have taken three months (at a grueling pace) to try. Past that, it would have taken many more years to finally resolve, taking into account the time necessary to exhaust all avenues of review. Accordingly, this factor weighs heavily in favor of approving the Settlements. *See Slomovics v. All for a Dollar, Inc.*, 906 F.Supp. 146, 149 (E.D.N.Y.1995) (citing *In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320, 324 (E.D.N.Y.1993)); *see also, e.g., Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 362 (S.D.N.Y. 2002) (approval granted where "[d]elay, not just at the trial stage but through post-trial motions and the appellate process, would cause Class Members to wait for years for any recovery, further reducing its value.").

---

**7.** Eric D. Green served as the mediator during the settlement negotiations from late 2002 until May 2003. (Green Dec. I ¶ 3, II ¶ 6.)

The second factor—the reaction of the class—may be the most significant factor in this inquiry. *See id.* The extremely small number of objectors—a mere 18 out of approximately five million Class members—heavily favors approval. *See* 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41, at 108 (4th ed. 2002) (*"Newberg"*) ("[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86–87 (2d Cir.2001) (holding that "[t]he District Court properly concluded that this small number of objections [18 where 27,883 notices were sent] weighed in favor of the settlement.").

The third factor also favors approval. Settlements were not reached literally until trial was about to commence, after complete and exhaustive discovery,[8] summary judgment proceedings, and substantial mediation.

The risks of establishing liability and damages at trial, and of maintaining the Class throughout the trial (the fourth, fifth, and sixth factors, respectively) also militate in favor of approval. Crucial to the plaintiffs' claims was their ability to prove that the tying arrangements had anticompetitive effects. In light of the procompetitive features of the "Honor All Cards" rule, this was no sure thing. Even

if liability had been established, the Class would still have faced the problems and complexities inherent in proving damages to the jury. The plaintiffs' theory of damages would have been hotly contested at trial. *See, e.g., In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y.1998) ("[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."). Even if they succeeded on that level, they would have faced the practical problem of asking jurors—who felt they had already absorbed the cost of high interchange rates through higher prices at the merchants' checkout counters—to absorb them once again through the higher bank fees that would result from a hefty damage award. Finally, it is possible that the Class could have been decertified or modified as the litigation continued. *See In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 89 (E.D.N.Y.2000) ("If factual or legal underpinnings of the plaintiffs' successful class certification motion are undermined once they are tested under a more stringent standard ... a modification of the order, or perhaps decertification, might then be appropriate.").

The seventh factor, the ability of the defendants to withstand a greater judgment, also supports approval of the Settlement Agreements. The compensatory relief by itself constitutes "the largest settlement ever approved by a federal court." (Coffee Dec. ¶ 12.)[9] The injunc-

---

8. These efforts included a review of approximately five million pages of documents, almost 400 depositions, discovery from roughly 200 non parties, 54 expert reports, and 21 expert depositions. (*See* Final Appr. at 26 (citing Constantine Dec. ¶¶ 7, 14–19, 23–26).)

9. Professor John C. Coffee, Jr., an expert retained by the Class, teaches at Columbia Uni-

versity Law School. (Coffee Dec. at II ¶ 6.) He is an authority on class action litigation, particularly the management of large class actions and attorneys' fees. (*Id.* ¶ 7.) In this regard, he has (1) testified before congressional committees; (2) published extensively on the subject (some of which publications have been relied upon by other federal courts); (3) testified in a number of class

tive relief will result in future savings to the Class valued from approximately $25 to $87 billion or more. (Fisher Suppl. Dec. ¶¶ 7–8.) I find that the defendants would not likely be able to withstand a significantly greater damage award.

Finally, I find that the Settlement Agreements are within the range of reasonableness in light of the best possible recovery and in light of all the attendant risks of litigation.

## 2. The Objections

As noted, there were several objections to the Settlements. I discuss the more substantive ones below.

### a. The Scope of the Releases

■ Two objections concern the scope of the releases. The "Pasta Bella objectors"[10] and NuCity Publications, Inc. ("NuCity") have filed objections on the ground that the releases improperly seek to bar their respective lawsuits in other courts. In response, Visa and MasterCard argue that there is sufficient overlap between the facts underlying the claims asserted here and the facts underlying those other actions to justify the release of the objectors' claims.[11] I conclude that claims asserted elsewhere by the Pasta Bella objectors and NuCity can be—and are in fact—extinguished by the releases.

The disputed releases provide, in pertinent part:

[T]he Released Parties shall be released and forever discharged from all manner of claims ... against the Released Parties ... that any Releasing Party ever had, now has or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, *claims which have been asserted or could have been asserted in this litigation which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act,* 15 U.S.C. § 1 *et seq.*

(Visa Settlement ¶ 28 (emphasis added); MasterCard Settlement ¶ 30 (emphasis added).) The "Released Parties" are defined as "Visa, Visa International Service Association, and their ... member financial institutions" (Visa Settlement ¶ t) and "MasterCard and any ... member financial institutions" (MasterCard Settlement ¶ v).

At the fairness hearing, Lead Counsel acknowledged that the releases cover the specified types of claims that were asserted or could have been asserted in this case, but only if the unasserted claims depend on the same factual predicate that underlie the claims that were brought in the instant case. (*See* Sept. 25, 2003 Hr'g Tr. at 95 ("Fairness Hr'g").) A release of such breadth is unobjectionable. *See TBK*

actions; and (4) served as an expert witness in many recent, significant class actions. (*Id.* ¶¶ 8–9, 11.)

10. The "Pasta Bella objectors" are Reyn's Pasta Bella, LLC, Jeffrey Ledon DeWeese, M.D., Barry Leonard d/b/a Critter Fritters, and Hat–In–The Ring, Inc. d/b/a Eddie Rickenbacker's.

11. Lead Counsel agree with Visa and MasterCard that the releases are proper but take no position on whether or not the actions filed in the two cases are barred. (Final Appr. at 36; *id.* at 46–47 ("Because ... the releases are proper ... and within Lead Counsel's authority to grant under the law, it is irrelevant whether or not the claims set forth in *Pasta Bella* or *NuCity* are extinguished or limited.").)

*Partners, Ltd. v. W. Union Corp.,* 675 F.2d 456, 460 (2d Cir.1982) ("[A] court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action"); *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.,* 660 F.2d 9, 18 n. 7 (2d Cir.1981) ("[A] settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts."); *Newberg* § 12:15, at 312 ("The scope of a judgment must be limited to the claims that were asserted or that may arise out of the transactions or events pleaded in the complaint.... A settlement may properly prevent class members from subsequently asserting claims relying upon a legal theory different from that relied upon in the class action complaint, but depending upon the same set of facts."). Thus, the only remaining question is whether the claims in the objectors' actions arise from the same set of facts as in the instant action.

In its putative class action in the Northern District of California, the Pasta Bella objectors allege, *inter alia,* that the setting of credit and debit card interchange fees by Visa and MasterCard on behalf of their member banks (including Bank of America, N.A., Wells Fargo Bank, N.A., and U.S. Bank, N.A.) constitutes price-fixing in violation of the Sherman Act. *Reyn's Pasta Bella, LLC v. Visa U.S.A.,* 259 F.Supp.2d 992, 997 (N.D.Cal.2003) *("Reyn's ").* The plaintiffs in the case purport to represent a class of

> all persons and business entities in the United States who are retailers, businesses, professions and merchants, including those "on-line," and presently have VISA and/or MASTERCARD merchant contracts with one or more member banks pursuant to which they have "sold" (deposited) VISA and MASTERCARD charge or debit receipts, or electronic equivalents, to one or more member banks for deposit in their commercial demand deposit bank account and have thereby incurred deposit fees.

(Pasta Bella's Sec. Am. Compl. ¶ 11.)

*Reyn's* is a virtual clone of the centerpiece of this case. In *Reyn's,* the plaintiffs challenge an agreement among Visa's and MasterCard's member banks to impose a uniform intercharge fee as a horizontal restraint of trade, in violation of section 1 of the Sherman Act. *Reyn's,* 259 F.Supp.2d at 998. The essence of that claim is that the intercharge fees are artificially (and anticompetitively) high because of concerted activity by Visa and MasterCard in violation of section 1. Here, the identical result is alleged to have resulted from concerted activity that is closely related to that alleged in *Reyn's*—the "Honor All Cards" rule that both defendants used to tie their debit products to their credit cards. In addition, both cases require proof of the anticompetitive effects of the elevated intercharge rates under a "rule of reason" analysis.

While the overlap in the factual predicates for the section 1 claims in each case would alone permit the release of the claims in *Reyn's,* the section 2 claims in the instant case truly end the inquiry. The Class here has repeatedly alleged, and was prepared to prove at trial, that the offending interchange rates were fixed by Visa and MasterCard. (*See, e.g.,* 2d Am. Compl. ¶ 45 ("The trend towards uniformity in pricing among dual Visa/MasterCard members has also been facilitated and exacerbated because Visa bank members collectively fix the Visa interchange fees and contemporaneously, acting as MasterCard members, collectively fix the MasterCard interchange fees. These

price fixed interchange fees are the bulk of the final 'discount fees' charged to retailers who accept Visa and MasterCard plastic cards."); Defs. Mem. Supp. Mot. Summ. J. at 59–60 (asserting that plaintiffs cannot make out their claim concerning inflated credit card interchange rates); Pls. Mem. Law. Opp. Defs. Mot. Summ. J. at 47–49 (asserting that there is evidence to show that defendants artificially inflated credit card interchange rates).)

Furthermore, every member of the putative class in *Reyn's* is a member of the Class in this case. The same is true of the plaintiffs in the NuCity action.[12] As such, there is no specter here, as there was in *National Super Spuds*, of settling plaintiffs giving away claims possessed only by absent class members in exchange for the settlement. *See TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982) (distinguishing *National Super Spuds* on ground that "[a]t the heart of our concern [in *National Super Spuds*] was the danger that a class representative not sharing common interests with other class members" would sacrifice the interests of those other class members).

In *National Super Spuds*, the class consisted of persons who had liquidated long positions in potato futures contracts and sought damages on that basis. A subset of the class also held unliquidated contracts. 660 F.2d at 11, 16. The proposed settlement, however, released claims based on both liquidated and unliquidated contracts. *Id.* at 14. The Second Circuit reversed the district court's approval of settlement. It

stated that the settlement was inequitable where "a class member holding one liquidated and one unliquidated contract receives no more than another class member holding only one liquidated contract." *Id.* at 19. The court further reasoned that "[t]here is no justification for requiring ... [the] release [of] claims based on unliquidated contracts as part of a settlement in which payments to class members are to be determined solely on the basis of the contracts they liquidated." *Id.* at 18.

Such circumstances are not present here. Rather, in exchange for an unprecedented amount of compensatory damages, plaintiffs here have released all claims based on the mix of facts that produced anticompetitive intercharge rates.

Finally, the Pasta Bella objectors correctly point out that the defendant banks in *Reyn's* are not parties to this case. However, that does not preclude the inclusion of the claims against those banks in the releases. *See In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002) ("[C]ourts recognize that it is appropriate for a class action settlement to include a limited release of a non-party ... where that non-party has contributed substantially to making the settlement possible"); *see also In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 149 (E.D.N.Y.2000); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 181 (E.D.Pa.1997). The defendants' member banks have not only contributed to the Settlements, but virtually all of the relief comes from them.

**12.** The Class includes merchants who accepted Visa and/or MasterCard credit cards for payment at any time during the period from October 25, 1992 to June 21, 2003. (*See* Settlement Notice ¶ 20.) The putative class in *Reyn's* includes merchants who had contracts with defendants' member banks to deposit their credit or debit receipts as of June 24, 2002. (Pasta Bella's 2d Am. Compl. ¶ 11; Pasta Bella Obj. at 8.) NuCity purports to represent two classes of merchants: (1) those who accepted Visa credit card transactions for the period from June 28, 1996 through October 9, 2001; and (2) those who accepted MasterCard credit card transactions for the period from June 28, 1996 through October 9, 2001. (NuCity's 2d Am. Compl. ¶ 27.)

(*See* Pls. Mem. Law Supp. Mot. Final Approval Settlements at 50 ("Final Appr.").)[13] The releases therefore cover the defendant banks in *Reyn's*.

The claims NuCity has advanced in *In re Visa/MasterCard Membership Rule Antitrust Litig.*, No. 01–CV–10027 (filed in the Southern District of New York) (the "NuCity action") are properly released as well. That putative class action alleges that Visa and MasterCard violated section 1 of the Sherman Act through their exclusionary membership rules, that is, their prohibition of their member banks from issuing or providing services to other credit cards (such as Discover or American Express). The effect of these rules, they allege, is inflated prices for credit card transactions. (NuCity's 2d Am. Compl. ¶¶ 29–31, 37.)

The exclusionary rules at the heart of the NuCity action are an integral part of the factual predicate of this case. From the beginning, the plaintiffs in this case have contended that defendants' "Honor All Cards" tying rules were supported, reinforced, and exacerbated by specific additional anticompetitive conduct, including exclusionary behavior. As part of their section 1 tying claim, plaintiffs argued that defendants' exclusionary rules created barriers to entry in the market for credit card services, thus solidifying defendants' power in that market and their ability to force merchants to accept their debit cards.

The exclusionary rules have been central to this case from its inception. In their complaint, plaintiffs alleged that

> Visa members collectively adopted a rule barring their members from issuing any plastic cards competitive with Visa cards. This rule exempted MasterCard, permitting Visa's dual members to continue issuing MasterCard plastic cards. Visa members then turned around and, acting as MasterCard members, adopted the same non-competition rule. The effect of these rules was to deprive existing and new competitors of a marketing outlet at the 6,000 largest and most appropriate vendors of their products, *i.e.*, the dual bank members of Visa and MasterCard.

(2d Am. Compl. ¶ 50); *see also id.* ¶¶ 52–54 (alleging that defendants asked their members to boycott American Express and Discover cards).) Plaintiffs made clear in opposing summary judgment that they would seek to carry their burden of proving predatory conduct in violation of section 2 by, *inter alia*, establishing the existence of these practices and by demonstrating that they exacerbated the anticompetitive effects of the defendants' tying arrangements. (*See* Pls. Reply Mem. Law Supp. Pls. Mot. Summ. J. at 3 n. 5 ("[P]laintiffs have consistently argued that ... the related anticompetitive conduct [*e.g.*, defendants' exclusionary rules] has reinforced and exacerbated the effects of the tie."); Pls. Mem. Law Supp. Pls. Mot. Summ. J. at 6–7, 52, 60; Pls. Reply Mem. Law Supp. Pls. Mot. Summ. J. at 23 n. 53; Suppl. Mem. Law Supp. Pls. Mot. Summ. J. Opp. Defs. Mot. Summ. J. at 13–14).) At the oral argument of the summary judgment motions on January 10, 2003, Lead Counsel expressly relied on the exclusionary rules as central to plaintiffs' claim that the defendants used those rules to "pummel[ ]" potential competitors in the

---

**13.** For example, they have already lowered their debit interchange rates as a result of the interim interchange reductions and have begun to send notice of the January 1, 2004 end-of-tying arrangement date. In addition, they will physically and electronically reconfigure more than 200 million debit cards and may also contribute to the compensatory relief via association fees. (Final Appr. at 50.)

debit services market. (Summ. J. Hr'g Tr. at 58–59.)

I have previously found the exclusionary rules of which NuCity complains to be a common issue in this case and among the claims in *United States v. Visa U.S.A., Inc.*, 163 F.Supp.2d 322 (S.D.N.Y.2001), *modified by* 183 F.Supp.2d 613 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir.2003), the government case on which NuCity piggy-backs. Based on that finding, I granted the government's motion to intervene in this action to allow Lead Counsel to share with the government their substantial analysis of the documents and depositions in this action. *In re Visa Check/Master-Money Antitrust Litig.*, 190 F.R.D. 309, 312 (E.D.N.Y.2000).

I conclude, in light of the principles of *Super Spuds* and its progeny, that NuCity's claims may properly be barred by the releases.

Last, NuCity argues that the notice to the Class of the proposed Settlements was improper because it did not inform the Class of the pending NuCity action and of the fact that the releases would extinguish it. They also complain that the notice did not report what consideration was given in exchange for the release of those claims. (NuCity Obj. at 8–13.)

These arguments are unpersuasive. The notice of the scope of the releases was adequate. Indeed, it recited the releases, word for word. (*See* Settlement Notice ¶ 18.) Thus, the expansive reach of the releases could not have been clearer. This is all that was required. *See Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir.1982)

(notice "must fairly apprise the prospective members of the class of the terms of the proposed settlement") (quotation marks omitted); *Newberg* § 11:53, at 167 (notice is only "adequate if it may be understood by the average class member"). There is no requirement that the Class be specifically apprised of all pending actions covered by the releases, as long as the releases themselves were sufficiently clear.

### b. *The Absence of Notice in Spanish*

■ Armenta's Mexican Food, Inc. ("Armenta's"), and Lupita Llamas Martinez d/b/a Del Yaqui Restaurant ("Llamas") contend that the Settlement Agreements should not be approved because the notices to the Class (transmitted by mail, publication, a website, and a toll-free telephone number) were provided only in English, and not in Spanish as well.[14] They maintain that this English-only notice did not comport with due process or Rule 23(e)[15] because "[t]he cost to include notice in Spanish in these print notices, and a link on websites and Spanish option at the telephone sites would have been negligible." (Armenta's and Llamas Obj. at 2–3.) The website argument is well-taken. It would have been a useful addition to the notice to have included a bulletin (in Spanish) that a Spanish translation of the notice was available on a specified website. However, the absence of notice in Spanish does not warrant the denial of approval of the Settlement Agreements.

To support their contention, Armenta's and Llamas rely on several statistics. For example, they report that in 2000 more than 2.4 million New Yorkers over five

---

14. Armenta's and Llamas do not argue that Spanish-speaking merchants failed to receive notice at all; rather, the claim is that they did not receive notice in Spanish. (Fairness Hr'g at 45.)

15. The current Rule 23(e), which became effective on December 1, 2003, provides, in relevant part: "The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Fed.R.Civ.P. 23(e)(B).

years old spoke Spanish at home (*id.* at 4), and that as of 1997, Latino- and Hispanic-owned businesses comprised some 1.2 million of the nation's 20.8 million businesses (*id.* at 4–5). But these objectors have failed to demonstrate that there is a sizeable group of merchants in the Class who could not comprehend the notice. When questioned about this deficiency at the fairness hearing, counsel acknowledged the lack of fit between the statistics cited and the proposition advanced.[16] Counsel nevertheless argued that Spanish-speaking merchants in general are "less comfortable with English than they are with Spanish." (Fairness Hr'g at 46.) I assume that is true, but a lack of comfort does not mean there was a significant defect in the notice. In any event, it does not rise to the level of a due process violation. The basic standard is one of reasonableness. *See Soberal–Perez v. Heckler,* 717 F.2d 36, 43 (2d Cir.1983) (" 'The notice must be of such nature as reasonably to convey the required information ... and it must afford a reasonable time for those interested to make their appearance.' " (quoting *Mul-lane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950))). There has been no showing here that the notice to the Class did not meet that standard.

### c. *Section 10 of the Visa Settlement*

■ Leonardo's Pizza By the Slice and 710 Corp. (collectively "Leonardo's Pizza") challenge paragraph 10 of the Visa Settlement, which essentially provides that Visa cannot enter into new, exclusive debit arrangements with member/owner financial institutions for a period of two years from the date of the Visa Settlement.[17] These objectors argue that this provision is objectionable for two reasons: (1) it fails to invalidate currently existing exclusive deals that prohibit such institutions from issuing a point-of-sale debit card for competing regional networks; and (2) the prohibition lasts for only two years, after which time Visa will once again be able to preclude competition from other non-MasterCard debit card networks. (Leonardo's Pizza Obj. at 4–5; Fairness Hr'g at 59

16. THE COURT: What was missing from your objection, and if I missed it I apologize. You had some interesting data about the number of Latino and Hispanic merchants. But I couldn't tell what percentage of them were unable to deal with an English language notice. I assume it is not all of them.

MR. RASMUSSEN: No, Your Honor. What we provided was the most recent census data we could find which was 1997.... The question is asked, as demographers phrase them, which language are you most comfortable with in speaking and reading. In that sense, as data, the evidence appears to be that approximately one half of the 30 some million U.S. households with Hispanic or Latino, and report themselves to be so, with approximately one half of them Spanish would be spoken in the home. Spanish in the newspapers and televisions would be preferred. They would indicate that they are not comfortable. They are less comfortable with English than they are with Spanish. To extrapolate from that is all we can do.
THE COURT: Is that the right universe?
MR. RASMUSSEN: No, of course not.
(Fairness Hr'g at 45–46.)

17. The full text of paragraph 10 is as follows:
For a period of two years from the date of the Settlement Agreement, Visa ... will not enter into a contract with a member financial institution that prohibits the financial institution from issuing an ATM and/or POS debit card of any competing ATM and/or POS network, other than one operating under a trademark owned by MasterCard. This provision does not affect the validity of existing agreements entered into prior to the date of this Settlement Agreement. Apart from this provision, nothing herein shall prohibit Visa from competing with any other payment card brand for the card issuing business of Visa member financial institutions.
(Visa Settlement ¶ 10.)

("For example ... if they have a current agreement with a member bank that is more than two years, clearly the paragraph means absolutely nothing. If the agreements are annual agreements, then the restriction limiting Visa's activity to two years means almost nothing.").) These objectors also complain that the MasterCard Settlement does not contain a similar provision. (Leonardo's Pizza Obj. at 5.) For their part, Lead Counsel assert that this provision will help "jump start[ ] competition in the debit market," and that the MasterCard Settlement does not include this "no exclusivity" provision because MasterCard, unlike Visa, never adopted a campaign to remove regional network marks from their member banks' debit cards. (Final Appr. at 78–79.)

The Class has the better of this argument. The "no exclusivity" provision is the result of hard-fought negotiations conducted against a fully developed factual background. It addresses an issue that would have been disputed at trial: whether Visa sought to stifle competition from the regional networks by having their logos removed from the backs of Visa debit cards. That the relief obtained in the Visa Settlement is limited in duration, or to postsettlement contracts, is of no concern.

Indeed, such compromises are the essence of a settlement:

> Contrary to the objectors' expectations, the settlement is not a wish-list of class members that the Defendant[ ] must fulfill. These ... objectors fail to understand that the form and amounts of benefit provided were arrived at as a result of hard-fought negotiations between experienced class action attorneys. Plaintiffs' counsel, having weighed the risks of proving liability and damages at trial, negotiated ... benefits in an amount and form that, in their judgment, would compensate plaintiffs ....

*Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 65 (S.D.N.Y.2003) (quotation marks omitted).

\* \* \* \* \* \*

■ For all of the foregoing reasons, I approve the Settlement Agreements.[18]

### B. The Allocation Plan

■ "As a general rule, the adequacy of an allocation plan turns on ... whether the proposed apportionment is fair and reasonable" under the particular circumstances of the case. *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133

---

18. The remaining objections to the Settlements are without any merit. Leonardo's Pizza requested that Class members be given a second opportunity to opt out of the Class now that the Settlements' terms are known. (Leonardo's Pizza Obj. at 6.) Because I have approved these Settlements as fair, however, due process does not afford Class members a second opportunity to opt out. *See Officers for Justice v. Civil Serv. Com'n*, 688 F.2d 615, 635 (9th Cir.1982); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at \*12 (S.D.N.Y. Nov. 26, 2002). I note that the revisions to Rule 23, which took effect December 1, 2003, permit judges, in their discretion, to direct a second opt-out opportunity. *See* Fed.R.Civ.P. 23(e)(3) ("[T]he court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."). I decline to exercise this option, in light of the infinitesimal number of objections by merchants.

Leonardo's Pizza also asserts that Class Counsel should publish on the Internet: (a) their system for distributing any money remaining in the common fund after distributions to absent Class members; and (b) that any motion for securitization of the award be published on the case website. (Leonardo's Pizza at 6–7.) There is no controversy on this issue, as Lead Counsel have stated in their papers that they will do so. (Final Appr. at 81–82.)

(S.D.N.Y.1997), *aff'd,* 117 F.3d 721 (2d Cir. 1997). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Am. Bank Note Holographics, Inc.,* 127 F.Supp.2d 418, 429–30 (S.D.N.Y.2001) (quotation marks omitted). Whether the allocation plan is equitable is "squarely within the discretion of the district court." *In re PaineWebber,* 171 F.R.D. at 132. I find that the plan is both fair and reasonable, and thus I approve it.

■ The plan works as follows. Class members will receive an award of money from the Net Settlement Funds[19] directly proportional to their debit and credit purchase volume (as well as online debit transactions) during the Class period, which is the period of time from October 25, 1992 to June 21, 2003. (Allocation Plan at ii-iii) ("Plan").[20] To do this, Class members need to provide only a minimal amount of information, and in some cases none at all. Specifically, Class members in the Visa Transaction Database—which includes records for a majority of the Class—do not need to provide any information in order to claim the portion of the Net Settlement Funds that corresponds with Visa and/or MasterCard debit and credit damages for the Class period between October 1, 1996 and June 21, 2003.[21] For the Class period prior to October 1996, Class members must produce a merchant contract, processor statement, or other information that demonstrates when they accepted Visa and/or MasterCard during that time period. The only transactional data that a Class member must supply are its processor statements showing the number and/or dollar volume of online debit transactions accepted during the Class period. (*Id.* ¶¶ 4–6.) This system relieves the Class of an enormous (and perhaps insurmountable) burden because, as Lead Counsel have represented, the merchants cannot reasonably produce the necessary records of transactions. (Final Appr. at 65.)

Notably, only two absent Class members object to the Plan: Roman Buholzer d/b/a The Continental Garden Restaurant ("Buholzer"), and Preston Center Personal Training, Inc. ("Preston Center"). The first objection concerns the proposed securitization of the Net Settlement Funds. The argument is that if Lead Counsel fail to obtain securitization for those monies, then Class Counsel will unfairly receive their fees first, to the detriment of the

---

19. The plan defines "Net Settlement Funds" as "Visa and MasterCard Gross Settlement Funds, less the amount of the Fee Award and Court-approved expenses, taxes, and costs of notice and administration." (Allocation Plan ¶ N.)

20. To determine what each Class members' proportional share is, the plan uses a methodology that approximates the amount each Class member was damaged for each dollar of Visa and/or MasterCard debit or credit transactions (as well as for each online debit transaction) accepted during the Class period. The claims administrator will utilize this methodology to compute individual Class member damages and claims by using debit and credit volumes from Visa and Master-Card's databases. Visa's database includes Visa debit and credit transaction counts and dollar volumes broken out by month for each Class member that accepted Visa transactions at any time between October 1, 1996 and July 31, 2003. (Plan ¶ 2.2.) MasterCard's database provides the same information for Class members that accepted MasterCard transactions from June 1, 2001 through June 30, 2003. (*Id.* ¶ 2.3.)

21. As Lead Counsel have represented, given the time frame for which there is Visa transaction data and the fact that "virtually all merchants who accept Visa's payment transactions also accept MasterCard's, [Visa's] database covers the vast majority of the Class." (Final Appr. at 66–67.)

Class members, who will be forced to await payment of fees before receiving any relief.[22] I have every reason to believe that once the Settlements are finally approved (*i.e.*, after the resolution of any appeals), Lead Counsel will be able to obtain the securitization for the benefit of the Class. Even if it were clear now that they could not do so, I would still approve the payment of attorneys' fees first. The harm to the Class in waiting for compensatory relief would be *de minimis*. Despite the size of the Net Settlement Funds, the far more significant relief for the individual merchants is the injunctive relief—the absence of artificially high and mandatory debit card transaction fees. Indeed, the Class has already received more than $300 million in compensatory damages as a result of Visa's and MasterCard's lowering of their debit card rates since August 1, 2003, which will continue until December 31, 2003. (Fairness Hr'g at 19.) In short, the proposed securitization of the Net Settlement Funds is no reason not to approve the settlements.

The other objection concerns Lead Counsel's purported unfettered discretion in accepting or rejecting late claims for relief by Class members. (Buholzer Obj. at 24 n. 12.) Because Buholzer has failed to offer any basis for its assertion that Lead

Counsel may improperly exercise their discretion over the Net Settlement Funds, and because the claims administrator must report all late claims to the Court, which can then accept or overrule Lead Counsel's disposition (*see* Plan ¶ 10), I find this objection to be unpersuasive.[23]

For all of these reasons, I am satisfied that the allocation plan is both fair and reasonable.

## C. *Attorneys' Fees*

■ The Second Circuit has held that the "lodestar" method of computation (*i.e.*, hours reasonably expended multiplied by a reasonable hourly rate, plus an enhancement, if appropriate) and the "percentage of the fund" method are both available to district judges in calculating attorneys' fees in common fund cases. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir.2000). The trend in the Second Circuit is toward the percentage method, *Sheppard v. Consol. Edison Co. of N.Y.*, No. 94–CV–0403, 2002 WL 2003206, at *7 (E.D.N.Y. Aug.1, 2002), which spares the court and the parties the "cumbersome, enervating, and often surrealistic process" of lodestar computation, *Goldberger*, 209 F.3d at 50 (quotation marks omitted). Even when the percentage method is used,

---

**22.** There was also an objection to the plan based on the perceived risk in securitization itself. (*See* Preston Center Obj. at 5 (counsel's "plan to 'securitize' the Visa and MasterCard payments places the settlement fund at risk").) This argument is unpersuasive; the point of securitization is to make the Net Settlement Funds *more* secure. Moreover, Lead Counsel must obtain prior approval of the Court before consummating any such transaction. (*See* Plan ¶ 11.17.)

**23.** Buholzer also argues that unlike large Class members, millions of small merchants will be unable to "submit appropriate information to the Claims Administrator." (Buholzer Obj. at 24.) However, as explained

above, the only Class members that must supply any information are those who accepted Visa transactions prior to October 1996, and even then they need only present minimal information. Buholzer has ignored how the plan minimizes the data requirements imposed on the merchants.

Buholzer further contends that the plan should not require the administrator to submit its reports on Class members' approved claims under seal. (Buholzer Obj. at 27–28.) I disagree. This procedure is necessary to protect merchants from the release of their relative volume of credit card and debit card transactions, which may be sensitive information in a competitive marketplace.

however, the Second Circuit "encourage[s] the practice of requiring documentation of hours as a 'cross-check' on the reasonableness of the requested percentage." *Id.* at 50. Courts in this circuit commonly adhere to this practice.[24]

No matter which method of calculation is employed, the key consideration in awarding fees is what is reasonable under the circumstances. *See id.* at 47. The traditional criteria in determining a reasonable common fund fee include: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.* at 50 (quotation marks omitted).

The Second Circuit has cautioned district courts, in applying these criteria, not to blindly follow a one-size-fits-all "benchmark" in determining the appropriate fee. Such a practice "could easily lead to routine windfalls where the recovered fund runs into the multi-millions." *Id.* at 52; *see also, e.g., In re Nasdaq Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y.1998) ("In many instances the increase [in the fund] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel."). Thus, in megafund cases particularly, courts have "traditionally accounted for these economies of scale by awarding fees in the lower range[s]." *Goldberger*, 209 F.3d at 52; *see also id.* (noting that in

cases with recoveries of between $50 and $75 million, courts typically award fees in the range of 11% to 19%); *In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689, 2003 WL 22244676, at *6 (S.D.N.Y. Sept.29, 2003) ("[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent."); *In re NASDAQ*, 187 F.R.D. at 486 (explaining that "absent unusual circumstances, the percentage will decrease as the size of the fund increases" and thus "[i]n cases where a class recovers more than $75–$200 million . . . . fees in the range of 6–10 percent and even lower are common.") (quotation marks omitted).

■ In determining a reasonable fee, it is also my responsibility to act as a "fiduciary . . . a guardian of the rights of absent class members." *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977) ("*Grinnell II* "), *abrogated on other grounds by Goldberger*, 209 F.3d 43 (quotation marks omitted); *see also Goldberger*, 209 F.3d at 52 ("The point is that plaintiffs in common fund cases typically are not fully informed. Nor are they able to negotiate collectively, or at arm's length. This is why we emphasized . . . that awards in these cases are proper only if made with *moderation*.") (quotation marks omitted). Accordingly, I must assess the

24. *See, e.g., In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689, 2003 WL 22244676, at *6 (S.D.N.Y. Sept.29, 2003); *In re Sterling Foster & Co., Inc. Sec. Litig.*, 238 F.Supp.2d 480, 489 (E.D.N.Y.2002); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *27 (Nov. 26, 2002); *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, 96 Civ. 0538, 2002 WL 1315603, at *2 (S.D.N.Y. June 17, 2002); *In re Twinlab Corp. Sec. Litig.*, 187 F.Supp.2d 80, 87 (E.D.N.Y.2002); *In re Arakis Energy Corp. Sec. Litig.*, No. 95 CV 3431, 2001 WL 1590512, at *15 (E.D.N.Y. Oct.31, 2001); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 CV 4318, 2001 WL 709262, at *6–7 (S.D.N.Y. June 22, 2001); *In re Fine Host Corp. Sec. Litig.*, No. MDL 1241, 3:97–CV–2619, 2000 WL 33116538, at *5–6 (D.Conn. Nov.8, 2000).

requested fee award with "a jealous regard to the rights of those who are interested in the fund." *Id.* at 53 (quotation marks omitted).

 Lead Counsel, on behalf of all Class Counsel, request a fee of $609,012,000. (Fee Pet. at 3.) They assert that this amount is 18% of the Fund (the discounted, present value of the total compensatory relief), 2.14% of the present value of the total relief (which includes a conservative estimation of the injunctive relief),[25] and 9.68% times the lodestar figure of $62,940,045.84.[26] A small group of absent Class members have objected to these figures.[27] Some recommended multipliers ranging from 2 to 4; some have urged me to award a percentage of the Fund, ranging from 5% to 10%.[28]

The requested fee is excessive. Indeed, after considering it against the backdrop of my obligation to fashion a fee award with a "jealous regard" for the financial interests of the five million merchants on whose backs the Settlements were achieved, I conclude that Lead Counsel's request to be paid almost 10 times their hourly rate is absurd.[29] The $609 million

25. One of Lead Counsel's experts estimated that the present value of the injunctive relief over the next 10 years would range between $25 and $87 billion, but that the "most plausible" value of the injunction was $70 billion. (Fee Pet. at 3 n. 3 (citing Fisher Dec. ¶¶ 7b, 43).) In its fee petition, Lead Counsel uses the "most conservative estimate" of about $25 billion. (*Id.* at 3.)

26. These multiplier and lodestar figures were revised from an original multiplier of 9.74 based on a total lodestar of $62,545,603. (*See* Fee Pet. at 64.) Subsequent to Lead Counsel's submission of their fee petition, they advised me that there had been errors made with respect to the lodestar figure that necessitated those slight revisions. (*See* Sept. 8, 2003 Ltr.)

27. As noted earlier, 17 merchants filed objections to the fee request. They are: Round House, Inc. d/b/a Smuggler's Cove; Ron Fred, Inc. d/b/a Bailey's; Ron Jen., Inc. d/b/a The Boathouse; Preston Center Personal Training, Inc.; Roman Buholzer d/b/a The Continental Garden Restaurant; Rent Tech, Inc.; Rental Solutions, Inc.; Thomas McMackin (as President of Wagner's Bakery, Inc.); Beaches N Cream; Kickers Corner of the Americas, Inc.; Leonardo's Pizza by the Slice; 710 Corp.; Sounds Deals, Inc.; Digital Playroom, Inc.; Southern Network Services, Inc.; Duke Products, Inc.; and Village Fabrics and Furnishings, Inc.

28. The only other substantive objection to the fee request concerns the appointment of a guardian, fee expert, and special master to represent the Class' interests in connection with the award of attorneys' fees. (Buholzer Obj. at 2.) The thrust of this complaint is that at this stage in the litigation, there is a conflict of interest between Lead Counsel and the Class, since both groups seek money from the same Fund. There is no need for appointment of a guardian or fee expert for the Class. I regard the functions such experts might perform to be part of my role. An independent auditor is another matter, and if Constantine & Partners had not retained one to audit the hours billed and the resulting fees, I might have had to appoint one to ensure fairness to the Class. As there has already been an independent audit, and there being no basis for me to doubt its validity, no such appointment is necessary. For the same reason, I reject the unfounded assertion that the attorneys' hours are inflated.

29. Lead Counsel argue that their multiplier of 9.68 is supported by the relevant case law. I disagree. For example, they point to *In re Buspirone Antitrust Litig.*, No. 01–MD–1410 (S.D.N.Y. Apr. 11, 2003), where the court awarded an 8.46 multiplier. That case presented unique circumstances, however, that are not present here. In an oral opinion, the court explained that it was allowing such a high hourly rate

because the case ha[d] settled before a substantial amount of additional work ha[d] been done which would have to be done if the case went forward to complete discovery [and] ... [d]uring all of that period the number of hours spent would have significantly increased. So the Lodestar would have gone up and the multiplier would have gone down.

request is not a useful starting point; it is not a figure from which reductions can be made based on nuanced disagreements with counsels' methodology or arguments. It is fundamentally unreasonable, and wholly out of character for a group of counsel whose commitment to the corner store merchants they represent has, until now, been admirable and unflagging. I therefore reject it entirely.

■ I hasten to add that an application of the six *Goldberger* factors indeed compels the award of an extraordinary fee. The first factor is the time and labor expended by counsel. Class Counsel have litigated this case—which did not culminate in settlement until the eve of trial— for seven years. During that time, there were almost 400 depositions of witnesses, including 21 experts who issued 54 expert reports; four rounds of class certification briefing (through the Supreme Court); 16 summary judgment motions, 31 motions *in limine*, and three *Daubert* motions; and a pretrial order identifying 230,000 pages of trial exhibits, 730 trial witnesses, and more than 17,000 deposition designations. (Fee Pet. at 30–31.)

Second, the magnitude and complexities of the litigation were enormous. The case involved almost every U.S. bank and more than five million U.S. merchants. As to complexity, Professor Harry First correctly describes the case as "a very complicated one, presenting, on virtually every legal point, unique issues with uncertain outcomes." (First Dec. ¶ 64.) [30]

Third, the litigation was very risky. Constantine & Partners devoted 52% of its attorney and paralegal resources to this case. (*See* Fee Pet. at 36.) Naturally, this investment of resources substantially impacted the firm's ability to staff other matters and to accept new profit-generating matters. Such a hardship weighs in favor of higher compensation, particularly where, as here, Lead Counsel did not benefit from any previous or simultaneous government litigation, *see, e.g., In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 142 F.R.D. 588, 597 (S.D.N.Y.1992) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made

---

*Id.* at 42–43. In another case, *Cosgrove v. Sullivan,* 759 F.Supp. 166 (S.D.N.Y.1991), the court's award yielded an 8.74 multiplier, but that case is also distinguishable based on unique circumstances. It concerned a public interest law firm battling the Department of Health and Human Services on behalf of a class of Medicare recipients (and doctors treating such recipients who had taken an assignment of benefits). The court held as follows:

When a small law firm successfully battles a huge bureaucracy to obtain justice for a class, with a result that confers enormous benefits on the class, such services should be appropriately rewarded. If they are not, there will simply be no incentive for public interest law firms to undertake such difficult assignments.

*Id.* at 169. *In re RJR Nabisco, Inc. Sec. Litig.,* No. 88 Civ. 7905, 1992 WL 210138 (S.D.N.Y. Aug.24, 1992), a pre-*Goldberger* case, is even

less persuasive. There, the court awarded a multiplier of 6 by automatically adhering to the 25% figure that the market generally paid—a practice disavowed in *Goldberger. Id.* at *7.

**30.** Professor Harry First teaches at New York University Law School. He specializes in antitrust and trade regulation, an area in which he has published casebooks and numerous articles. He also served from 1999 to 2001 as Chief of the Antitrust Bureau of the New York State Attorney General's Office. (First Dec. ¶ 1.) He explained that the case was so difficult because, *inter alia:* (1) certain presumptions were unavailable; (2) the description and analysis of tying debit to credit products proved more challenging than in the typical case; and (3) the defendants' market power was particularly difficult to prove. (Fee Pet. at 32–33 (citing First Dec. ¶¶ 9–17, 20–33).)

the kill. They did all the work on their own.").[31]

Fourth, the excellence of the representation of plaintiffs, especially in light of the very high quality of opposing counsel, cannot seriously be debated. Constantine & Partners is a premiere plaintiffs' litigation firm, specializing in antitrust litigation particularly and complex commercial litigation generally. Its work is uniformly excellent, and thus it is no surprise that it has led the effort that produced the largest antitrust settlement ever. *See Goldberger*, 209 F.3d at 55 ("[T]he quality of representation is best measured by results.")

The fifth factor is the relationship of the fee to the Settlements. Here, the Settlements are so large, particularly considering the injunctive relief, that even the exorbitant fee I award seems small in comparison.

Last, public policy considerations support a substantial fee award. Although Lead Counsel's descriptions of their accomplishments have not been free of hyperbole, I agree that the Settlements have produced significant and lasting benefits for America's merchants and consumers. The fees awarded must be reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the future. *See id.* at 51 ("There is ... com-

mendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.").

 Considering all of these factors, and in light of all of the circumstances of this case, I award attorneys' fees in the amount of $220,290,160.44. This amount represents approximately 6.511% of the Fund. The lodestar cross-check, which results in a multiplier of 3.5, further convinces me that my award is reasonable. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir.2001) (in surveying cases with megafunds over $100 million, found lodestar multiplier of 1.35 to 2.99 common); *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y.1998) ("multipliers of between 3 and 4.5 have become common" (quotation marks omitted)).

Lead Counsel have warned that an award of such a small percentage, based on the declining percentage approach, would operate to "punish[ ] attorneys who recover large settlements as a direct result of their outstanding efforts." (Fee Pet. at 58.) Their experts have advised that an inverse relationship may properly exist between the percentage of recovery and the lodestar multiplier, at least where the percentage falls below the norm.[32] Here, Lead Counsel have asserted that their re-

---

**31.** Indeed, the government piggybacked on Class Counsel's efforts. Two years after this action was filed, the Federal Trade Commission began investigating the practices of defendants at issue here, using the briefings and documentation of Lead Counsel. (Constantine Dec. ¶¶ 26–30.) Based in part on this information, the Department of Justice filed its lawsuit against Visa and MasterCard based on their exclusionary practices. *See United States v. Visa U.S.A., Inc.*, 163 F.Supp.2d 322 (S.D.N.Y.2001), *modified by* 183 F.Supp.2d 613 (S.D.N.Y.2001), *aff'd*, 344 F.3d 229 (2d Cir.2003). As noted earlier, in January 2000, I granted the government's motion to intervene in this action to allow Lead Counsel to

share with the government their substantial analysis of the documents and depositions in this action. *In re Visa Check/MasterMoney Antitrust Litig.*, 190 F.R.D. 309, 312 (E.D.N.Y. 2000).

**32.** *See* Coffee Dec. ¶ 45 ("[T]he more the percentage of the recovery falls below the norm, the more the multiplier may rise above the average. One balances the other.") (quotation marks omitted); Miller Dec. ¶ 21 n. 4 ("The use of a lodestar/multiplier methodology in mega-fund cases becomes a less reliable cross-check. This is because the multiplier is generally above the norm in these cases even though the percentage of recovery may be

quest of 18% is well below the norm for megafund cases (*id.* at 54–57), and thus it is to be expected that their multiplier will be as high as 9.68. I am mindful of both contentions. Were the case not so fully litigated, settling only on the eve of opening statements, a larger multiplier might well be necessary to properly reward Class Counsel and encourage counsel to bring similar cases in the future. Were the Fund not so large, dwarfing the funds in all of the cases Lead Counsel have cited,[33] a larger percentage might be appropriate. But given the circumstances as they are, my award is appropriate. Only in comparison to the amount sought can it be considered anything but generous. If it amounts to punishment, I am confident there will be many attempts to self-inflict similar punishment in future cases.

Lead Counsel also claim that their requested fee is justified if one considers the massive economic benefits of the injunctive relief. (*Id.* at 49–52.) They assert that their requested fee is "reasonable, and indeed conservative" because it is only 2.14% of the total settlement ($3,383,400,000 in compensatory relief plus $25,076,000,000 in injunctive relief). (*Id.* at 52.) I agree that the substantial injunctive relief here should inform my decision on awarding fees, and it has.

Last, I award Lead Counsel reimbursement from the Fund for $18,716,511.44 in costs and expenses. The lion's share of these expenses reflects the costs of experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses. (*Id.* at 69.) I see no reason to depart from the common practice in this circuit of granting expense requests. *See In re Arakis Energy Corp. Sec. Litig.*, No. 95 CV 3431, 2001 WL 1590512, at *17 n. 12 (E.D.N.Y. Oct.31, 2001).[34]

lower than the norm. To rely too heavily on the lodestar/multiplier methodology in such cases would thus eviscerate the percentage of recovery method, which I think is the appropriate metric."). Professor Arthur R. Miller teaches at Harvard Law School. He has authored many books and treatises, including *Federal Practice and Procedure,* as well as law reviews and articles on the subject of class actions and attorneys' fees. He also served as reporter for the Third Circuit's Task Force on Court Awarded Attorneys' Fees. (Miller Dec. ¶¶ 1–3.)

**33.** Most of the megafund cases cited by Lead Counsel do not involve funds even approaching the $1 billion mark, let alone the more than $3 billion mark of this action. Similarly, most of the cases cited by Lead Counsel do not involve multipliers at or near that in this action. Certainly, none of these cases possess both qualities. *See, e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050–51 (9th Cir.), *cert denied,* 537 U.S. 1018, 123 S.Ct. 536, 154 L.Ed.2d 425 (2002) (awarding 28% of an approximate $97 million dollar fund, which produced a 3.65 multiplier); *In re Buspirone Antitrust Litig.*, No. 01–MD–1410, at 4, 42–45

(S.D.N.Y. Apr. 11, 2003) (awarding 33.3% of a $220 million dollar fund, which produced a multiplier of 8.46); *In re Cardizem CD Antitrust Litig.*, No. 99–MD–1278, at 18–20 (E.D.Mich. Nov. 26, 2002) (awarding 30% of a $110 million dollar fund, which produced a multiplier of 3.7); *In re Methionine Antitrust Litig.*, No. C 99–3491, MDL No. 00–1311, at 1, 8–9 (N.D.Cal. Oct. 3, 2002) (awarding approximately 22.6% of a $107 billion dollar fund with a multiplier of approximately 1.85); *In re Vitamins Antitrust Litig.*, No. 99–197, MDL 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (awarding about 34% of about a $360 million dollar fund); *Kurzweil v. Philip Morris Cos.*, Nos. 94 Civ. 2373, 94 Civ. 2546, 1999 WL 1076105, at *1–2 (S.D.N.Y. Nov.30, 1999) (awarding 30% of about a $124 million dollar fund, which produced a multiplier of 2.46); *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393, 399–400 (S.D.N.Y.1999) (awarding 27.5% of a $116.6 million dollar fund, which produced a multiplier of 2.5).

**34.** There was one objection to reimbursement of expenses. The objector asserts that I should award attorneys' fees calculated on the

## CONCLUSION

For the reasons stated above, I approve the Settlement Agreements and the plan of allocation. I order the award of $220,290,160.44 in attorneys' fees to Class Counsel (to be distributed by Lead Counsel), as well as reimbursement for costs of $18,716,511.44.

So Ordered.

---

net recovery to the Class, excluding costs and expenses. (*See* Buholzer Obj. at 17–19.) I disagree. *See Powers v. Eichen,* 229 F.3d 1249, 1258 (9th Cir.2000) (explaining that it makes no difference whether attorneys' fees are based on the net or gross recovery, so long as the fee is reasonable).